# In the United States District Court
# for the Southern District of Georgia
# Waycross Division

STAMEY CATTLE CO., LLP,

      Plaintiff,

And

SUNSHINE HEIFERS, LLC,

      Intervening Plaintiff,

      v.

WILLIAM P. WRIGHT, JR.; WILLIAM
P. WRIGHT, JR., D/B/A THE
WRIGHT FAMILY DAIRY FARMS, LLC;
THE WRIGHT FAMILY DAIRY, LLC,
D/B/A, THE WRIGHT FAMILY DAIRY
FAMRS, LLC; W.P. WRIGHT FAMILY,
LLC, D/B/A, THE WRIGHT FAMILY
DAIRY FARMS, LLC; LOWER APPLING
COUNTY HOLSTEINS, LLC; FIRST
BANK SHARES OF THE SOUTHEAST,
INC., D/B/A FIRST NATIONAL BANK
SOUTH, GLENDA WRIGHT, ASBURY
FARMS, LLC, LEVI WRIGHT, AND
STAMEY CATTLE COMPANY, LLP,

      Defendants.

No. 5:17-cv-147

## ORDER

Before the Court are the following motions: Defendants
William P. Wright, Jr., and William P. Wright, Jr., d/b/a The
Wright Family Dairy Farms, LLC (collectively "Pete Wright")'s
Motion for Summary Judgment, dkt. no. 100, Defendant The Wright

Family Dairy, LLC, d/b/a The Wright Family Dairy Farms, LLC ("WFD")'s Motion for Summary Judgment, dkt. no. 101, Defendant W.P. Wright Family, LLC, d/b/a The Wright Family Dairy Farms, LLC ("WPW")'s Motion for Summary Judgment, dkt. no. 103, and Plaintiff Stamey Cattle Company, LLP ("Plaintiff")'s Motion for Partial Summary Judgment, dkt. no. 104.[1] These motions have been fully briefed and are ripe for review. For the reasons set forth below, Plaintiff's Motion, dkt. no. 104, is **GRANTED** with respect to Count One and Crossclaim Count VIII and **DENIED** as **MOOT** with respect to Counts Two and Three; Defendants Pete Wright, WFD, and WPW's Motions, dkt. nos. 100, 101, 103, are **GRANTED** with respect to Counts Seven and Eight and Crossclaims Counts II and IV; Defendants Pete Wright and WFD's Motions, dkt. nos. 100, 101, are **DENIED** with respect to Counts One, Four, Six, Ten, Eleven, and Twelve and Crossclaim Counts I, III, V, VI, and VIII, and their Motions are **DENIED** as **MOOT** as to Counts Two and Three; Defendant WPW's Motion, dkt. no. 103, is **GRANTED** with respect to all counts. Counts Five and Nine and Crossclaim Count VII[2] are **DISMISSED** as **MOOT**.

---

[1] Defendants argue in their motions that The Wright Family Dairy Farms, LLC, does not exist. Even if this is the case, Plaintiff points out, as explained below, that Pete Wright was involved with multiple entities with similar names, and more importantly, Plaintiff lists Pete Wright, WFD, and WPW in the Complaint and Crossclaims. In other words, the name designation is not sufficient grounds for granting summary judgment against Plaintiff. Thus, for the purposes of this Order, the Court will disregard the "d/b/a The Wright Family Dairy Farms, LLC" designation and instead focus on the individual parties of Pete Wright, WFD, and WPW.

[2] The Crossclaim count for constructive trust is incorrectly labeled "Count VIII" in Plaintiff's Crossclaim. Dkt. No. 65 at 78. The count should have been listed as "Count VII". As such, the Court will refer to the crossclaim

AO 72A
(Rev. 8/82)

Defendants' Motion in dkt. no. 102 is **MOOT** and **WITHDRAWN**.[3] Default Judgment against Defendant Lower Appling County Holsteins ("LACH") is **GRANTED**.

## BACKGROUND

This case involves a purchase of cattle between two family businesses and a forty-year history of doing business together gone awry. Specifically, this case involves the purchase of cattle by Pete Wright or one of his business entities from Plaintiff, Stamey Cattle Company, LLP. Plaintiff is a North Carolina based company in the business of raising and selling registered and grade cattle, primarily dairy cattle, domestically and abroad. Dkt. No. 117 ¶ 1.[4] Plaintiff has two partners—David Stamey and Robert "Bob" Stamey. Dkt. No. 118-1 ¶ 2.[5]

---

for constructive trust as Count VII and the crossclaim for successor liability as Count VIII in this Order.

[3] During the Motions Hearing on November 19, 2018, counsel for Defendants informed the Court that one of its motions for summary judgment was moot due to the settlement with Sunshine Heifers. After checking his records, counsel for Defendants informed the Court that the motion was Dkt. No. 103, and counsel for Plaintiff stated that Plaintiff had no objection to that motion being marked as moot. The Court ordered from the bench that Dkt. No. 103 be marked as moot and withdrawn. However, the motion that counsel for the Defendants and the Court were referring to—a motion involving Sunshine Heifers's claims against Defendants—was actually Dkt. No. 102. Dkt. No. 103 should not have been marked as moot and withdrawn. Therefore, pursuant to Federal Rule of Civil Procedure 60(a), the Court corrects this mistake and orders that Dkt. No. 102 be marked as moot and withdrawn. Furthermore, Dkt. No. 103 is at issue before the Court and is resolved in accordance with this Order.

[4] Throughout this Order, the Court cites only those statements in Plaintiff's Statement of Undisputed Material Facts that Defendants explicitly admit.

[5] Throughout this Order, the Court cites only those statements in Defendants' Statement of Undisputed Material Facts that Plaintiff explicitly admits.

AO 72A
(Rev. 8/82)

## A. The Parties

Defendants in this case include Pete Wright, his family members, and various business entities that he or his family are involved with in some capacity. Pete Wright is a dairy farmer who lives in Georgia with his wife, Glenda Wright, and his sons, Raymond and Levi Wright. Id. ¶ 6. Pete and Glenda are the sole members of the Wright Family Dairy, LLC, ("WFD") with Pete being the principal owner and managing member. Id. ¶ 9; Dkt. No. 117 ¶ 3. WFD formerly ran a dairy operation. Dkt. No. 118-1 ¶ 10. Pete and Glenda Wright also owned W.P. Wright Family, LLC ("WPW"), which at least at one point functioned as a landholding company. Id. ¶ 12. Raymond Wright is the sole member of Lower Appling County Holsteins, LLC ("LACH"), and Pete Wright, as an employee of LACH, was in charge of all of LACH's finances.[6] Dkt. No. 117 ¶¶ 31-32. LACH was created in order to lease the dairy operation of WFD. Id. ¶ 24. Pete Wright's residence, WPW's registered office and the dairy operations and offices of WFD and LACH were located at the same address: 18 Holstein Lane, Baxley, Georgia 31513 ("Dairy Property"). Dkt. No. 1 ¶ 4; Dkt. No. 7 ¶ 4; Dkt. No. 117 ¶ 46; Dkt. No. 104-3 at 2, 72, 77. Pete Wright, WFD,

---

[6] Plaintiff's Cross Claims include claims against Lower Appling County, LLC ("LAC"), but Plaintiff states that "no such entity . . . is registered with the Secretary of State of Georgia" and therefore "[t]o the extent that [LAC] does exist, it will be considered synonymous with [LACH]." Dkt. No. 65 ¶ 153. Based on the Court's review of the record, no party disputes that LACH and LAC are the same entities. Thus, based on this statement, the Court will consider LAC to be the same entity as LACH for the purposes of this Order.

AO 72A
(Rev. 8/82)

WPW, and LACH are the only Defendants at issue before the Court in the Parties' Motions. However, other Defendants relevant to the facts in this Order include Hurricane Creek Dairy, LLC—a dairy owned by Levi Wright as the sole member—and Asbury Farm, LLC—an entity that Pete Wright testified was created to hide money and avoid creditors. Dkt. No. 117 ¶¶ 55-58; Dkt. No. 104-2 at 55. At the time of this Order, the property on which WFD and LACH's dairy operated has been foreclosed, and WFD, WPW, and LACH are now dissolved. Dkt. No. 117 ¶ 64; Dkt. No. 104-2 at 1, 14, 18-20, 55.

### B. Pete Wright's Involvement with WFD and LACH

Pete and Raymond Wright formed LACH around August 1, 2016. Dkt. No. 118 ¶ 14. LACH leased the dairy and equipment on the Dairy Property owned by WFD from WFD. Dkt. No. 117 ¶ 24. At the time that LACH was formed, Pete Wright and WFD had substantial debts, including debts to First National Bank South ("FNB South"), Sunshine Heifers, LLC ("Sunshine Heifers"), the IRS, and other creditors. Id. ¶ 25. Raymond Wright testified that this lease arrangement between LACH and WFD would allow LACH to operate the dairy and collect proceeds from the dairy's milk production while allowing WFD to avoid its creditors. Dkt. No. 104-5 at 7. WFD and LACH were located on the same property—the Dairy Property—and employed many of the same employees, such as Harvey Prater, Pete Wright's office manager. Dkt. 119-4 at 7.

AO 72A
(Rev. 8/82)

Moreover, Pete, while continuing as the managing member of WFD, simultaneously worked for LACH managing all of LACH's finances. Dkt. No. 104-2 at 40. While Raymond was the sole member of LACH, he did not handle "the office stuff." Dkt. No. 104-5 at 7. As Pete testified, he was "in control of the money" for the entire existence of LACH. Dkt. No. 104-2 at 40. While in control of LACH's finances, Pete Wright transferred significant amounts of money from LACH's bank account to WFD, from LACH's bank account to his personal account, and from WFD's bank account to his personal account. See, e.g., Dkt. No. 117 ¶¶ 34-35, 37-40; Dkt. No. 104-2 at 40-49. Some of this money was transferred from LACH to pay off WFD's and Pete Wright's debts. Dkt. No. 104-2 at 41; Dkt. No. 104-5 at 8. Some of this money was used to pay for Pete Wright's personal expenses such as a speeding ticket and repairs for his personal truck. Dkt. No. 104-2 at 41, 45. These transfers between accounts were substantial—Glenda Wright testified that in 2016 transfers from the businesses to her and Pete's personal accounts exceeded $200,000. Dkt. No. 104-6 at 10. Glenda Wright testified that "[t]ransfers were made, yes, from all accounts simply because we had to pay everything either by cash, cashier's check. Nobody would take our checks at that point." Dkt. No. 104-6 at 9. Despite being LACH's sole member, Raymond was not aware of these transfers or why Pete was making them. Dkt. No. 140-5 at 10 ("I don't really know what he was paying with any of that money.").

AO 72A
(Rev. 8/82)

## C. The Purchase of Cattle from Plaintiff

During the time that WFD was leasing dairy operations to LACH in February 2017, Pete Wright, by or through WFD and LACH, traveled to North Carolina to select cattle to purchase from Plaintiff. Dkt. No. 117 ¶¶ 11-12. Pete Wright's businesses had been buying cattle from Plaintiff for 40 years and had purchased approximately $40 million in cattle from Plaintiff. Id. ¶¶ 7-8. Typically, in their past dealings, Pete Wright would travel to Plaintiff's farm in North Carolina and select specific cattle to purchase, and those cattle would be shipped to Pete Wright's operations in Georgia. Id. ¶¶ 9-10. On this occasion, in February 2017, Pete Wright selected cattle for purchase, and Plaintiff evidenced the sale of the cattle in invoices prepared by Plaintiff. Dkt. No. 118-1 ¶¶ 25-26. The invoices included who the cattle were sold to, address, a phone number of the seller, the date, cattle identification, the itemized price per cattle, and a total invoice price. Id. ¶ 27. A table provided by Defendants summarizes the invoices for cattle purchased by WFD and LACH from Plaintiff in 2017:

| Load | Sold To | Date | Invoice No. | Invoice Amount |
|------|---------|------|-------------|----------------|
| "Load 1" | WFD | 2/8/17 | 2017-501 | $16,775.00 |
| "Load 2" | LACH | 2/21/17 | 2017-503 | $70,000.00 |
| "Load 3" | LACH | 2/23/17 | 2017-504 | $74,000.00 |
| "Load 4" | LACH | 3/2/17 | 2017-505 | $72,000.00 |

AO 72A
(Rev. 8/82)

| "Load 5" | LACH | 3/7/17 | 2017-506 | $57,900.00 |
| "Load 6" | LACH | 3/25/17 | 2017-510 | $28,000.00 |
| "Load 7" | WFD | 6/5/17 | 2017-514 | $96,800.00 |

Dkt. No. 118-1 ¶ 29.[7] Plaintiff shipped the cattle to WFD and LACH on these dates with health papers and identification tags in the ears of the cattle. Dkt. No. 117 ¶ 17.[8] Payments for the cattle were to be made through milk check assignments from WFD and LACH's dairy operations. Id. ¶ 14; Dkt. No. 7 ¶ 23.

### D. Termination of the Lease and WFD's Takeover of LACH

In early May of 2017, Pete and Raymond Wright had a disagreement concerning the management of LACH. Dkt. No. 117 ¶ 47. Pete Wright testified that they "had a dispute about the milk check before I ran him off." Id. ¶ 48. This dispute escalated into a lawsuit between WFD and LACH, which ultimately ended with WFD terminating the lease with LACH on May 11, 2017, retaining control over all dairy operations, property, and equipment, and absorbing LACH's assets—including LACH's cattle. Dkt. No. 104-2 at 3, 18; Dkt. No. 104-5 at 8. Pete Wright testified that when WFD took over LACH's cattle, it took "all of the cows over," including those

---

[7] Although Plaintiff disputes this table of invoices, the dispute is only over whether the cattle were ultimately sold to third parties, not that the information in the table is incorrect. Dkt. No. 118-1 at 29.

[8] Pete Wright testified that he removed the Stamey identification tags from the cows' ears after they were delivered to him, which made identifying which cows were purchased from Plaintiff versus other cows, like those leased from Sunshine Heifers, difficult. See Dkt. No. 104-2 at 25, 28. However, some of the cattle still had some form of metal clip and an "RFID" tag in their ears, which could provide some form of identification. Id.

AO 72A
(Rev. 8/82)

sold by Plaintiff to LACH that Pete selected in February. Dkt. No. 104-2 at 18.

After the termination of the lease and WFD's taking over of LACH's cattle, Plaintiff made the final delivery of cattle, Load 7, on June 5, 2017. Dkt. No. 117 ¶ 19. Defendants admit that at the time of this delivery, WFD and LACH were insolvent and that Plaintiff had not been fully paid for the prior loads of cattle purchased. Id. ¶ 19. Prior to this point, LACH had been paying a milk assignment check to Plaintiff to pay for the cattle. Dkt. No. 104-4 at 2. However, after the termination of the lease, WFD initiated a monthly recurring milk check assignment to Plaintiff of $35,823.00 to replace the initial milk check assignment from LACH. Id. at 3; Dkt. No. 104-2 at 19. The assignment stated that "[s]uch payments to the assignee are to continue until I provide written notice of termination to the Association. Consent of the assignee is not required to terminate this assignment." Dkt. No. 104-4 at 3. In accordance with this provision, WFD cancelled its milk check assignment to Plaintiff on July 12, 2017, id. at 4, because WFD did not have enough money to pay Plaintiff and chose to pay other creditors with what money was left from its milking operations, dkt. no. 104-2 at 32. When Plaintiff found out about the cancelation of the milk check assignment, it made overtures to Pete Wright to finalize payment for the satisfaction of the

AO 72A
(Rev. 8/82)

outstanding debt on the cattle purchased from Plaintiff. Dkt. No. 117 ¶ 53.

### E. Pete Wright Sells Off the Cattle

On or about July 18, 2017, Pete and Levi Wright organized a sale and purchase of cattle with Gutman Brothers, Ltd. ("Gutman"). Dkt. No. 118-1 ¶¶ 57-58. In this transaction, WFD sold cattle to Gutman for $500,000. Id. ¶ 58. At least some of the cattle sold in this transaction included cattle sold to WFD and LACH by Plaintiff, and money was still owed to Plaintiff for those cattle at that point. Dkt. No. 104-2 at 35. Pete had his bank, FNB South, place the money from the Gutman sale in escrow to be used by Levi to purchase new cattle from Gutman for Levi's dairy, Hurricane Creek. Id. at 35-36. Pete discussed the Gutman transactions with Levi and FNB South before it occurred. Id. at 35. Pete did not tell Plaintiff about the Gutman sale in advance. Id. at 36.

On or about August 23, 2017, WFD sold cattle to New Holland Stable Sales ("New Holland"). Dkt. No. 118-1 ¶ 63; Dkt. No. 104-2 at 34. Pete Wright testified that some of the cattle sold to New Holland could have included cattle sold to WFD and LACH from Plaintiff. Dkt. No. 104-2 at 34. Moreover, Pete testified that he set up the company Asbury Farm, and he directed New Holland to send money from the sale to Asbury Farm. Id. He testified that he did this to try to keep the money from that sale out of creditors

hands and "hide it." Id. at 34, 55. When asked why he created Asbury Farm and if it was done to move assets from WFD to Asbury Farm, to liquidate those assets and sell cattle and receive the proceeds from those assets and cattle, Pete invoked the Fifth Amendment. Id. at 17. Pete Wright's plan of having the money from the New Holland sale sent to Asbury Farm ultimately did not occur after someone at New Holland noticed brands or tags on the cattle. Id. at 34. Around this same time, WFD also sold cattle, including eleven Holstein bulls purchased from Plaintiff, to Dixie Livestock. Id. at 27.

Sometime around September 2017, Pete Wright called Robert and David Stamey and told them "to come get" their cattle, and Pete testified that at the time, he believed he owed Plaintiff about $200,000 for the cattle. Id. at 38. Pete testified that "I told [Robert and David Stamey] to come get enough cows that was left to cover the rest of their money." Id. Robert Stamey testified that Pete called him and said "Bob, I can't pay for those Jerseys. You need to come get them." Dkt. No. 110-1 at 111. Pete maintained in his deposition that the Stameys decided not to come retrieve their cattle, dkt. no. 104-2 at 39, but Robert Stamey testified that he and David traveled to the Dairy Property in early September 2017 only to learn that Pete had already sold the Jersey cattle that they came to retrieve, dkt. no. 110-1 at 101. Robert also testified that when they asked Pete how many of their cows were

left there, Pete responded, "I don't know." Id. Pete Wright testified that he asked Robert and David to work with him while he tried to sell his dairy to a buyer to pay the balance of the cattle to Plaintiff, but that sale never occurred. Dkt. No. 104-2 37-38.

### F. The Final Cattle Sale and Plaintiff's Invoices

On October 6, 2017, Plaintiff, and other creditors of Pete Wright, WFD, and LACH, which included FNB South and Sunshine Heifers, met together to organize a final sale to liquidate the remaining cattle in Pete Wright and WFD's possession. Dkt. No. 118-1 ¶¶ 66-67; Dkt. No. 117 ¶¶ 62-63. The proceeds of the sale resulted in $188,681.86, and that amount was held in trust. Dkt. No. 118-1 ¶ 68.

Also, on October 6, 2017, the Stameys met with Pete Wright to sign five invoices—for loads 1, 4, 5, 6, and 7—and two statements of account for the balances owed by WFD and LACH. Id. ¶ 33. These documents included the statement "Title will transfer when full payment is received" next to the signature line. Id. Pete Wright signed them on October 6, 2017, with the signature "W.P. Wright, Jr." Id. ¶¶ 33-34, 38. However, invoices for "Load 2" and "Load 3," which also included the statement "Title will transfer when full payment is received," were signed upon delivery in February of 2017. Dkt. No. 110-1 at 43-45. But, Pete Wright testified that the signature on those two invoices—"Pete Wright"—was not his

AO 72A
(Rev. 8/82)

signature; he stated that he signs his name "W.P. Wright, Jr."
Dkt. No. 104-2 at 19-20; Dkt. No. 119-4 at 9. As of October 6,
2017, the statements of account signed by Pete Wright showed that
WFD owed a balance to Plaintiff of $44,960.97 and LACH owed a
balance of $182,798.29 for the cattle purchased from Plaintiff.
Dkt. No. 116-1 Ex. H, I.

### G. Procedural History

On November 3, 2017, Plaintiff sued Pete Wright, WFD, LACH,
WPW, and FNB South over its sale of cattle to Pete Wright, WFD,
and LACH and for the bank's involvement in Pete Wright's subsequent
sales of the cattle. Specifically, Plaintiff brought claims for
breach of contract (Count One), promissory estoppel (Count Two),
unjust enrichment (Count Three), fraud and fraud in the inducement
(Count Four), implied trust (Count Five), enforcement and
foreclosure of a purchase-money lien (Count Six), civil conversion
(Count Seven), civil conspiracy (Count Eight), and declaratory
judgment (Count Nine). Dkt. No. 1 at 11-20. Plaintiff also
requests prejudgment interest (Count Ten), attorneys' fees and
litigation costs (Count Eleven), and punitive damages (Count
Twelve). Id. at 20-21.

After Plaintiff filed its initial Complaint, Sunshine Heifers
filed suit as an intervening plaintiff on March 6, 2018, against
WFD, LACH, Pete Wright, Glenda Wright, Asbury Farms, Levi Wright,
FNB South, Hurricane Creek, Raymond Wright, and Stamey Cattle

Company. Dkt. No. 27. In response, Plaintiff filed counter claims against Sunshine Heifers and added crossclaims against several defendants. Id. at 64-80. Specifically, Plaintiff added crossclaims of fraud (Count I), civil conversion, livestock theft and theft by deception (Count II), tortious interference with a security interest (Count III), civil conspiracy to commit civil conversion, livestock theft and theft by deception (Count IV), civil conspiracy to commit tortious interference with a security interest (Count V), fraudulent transfers (Count VI), constructive trust (Count VII),[9] and successor liability (Count VIII). Id. at 67-80. Some of these crossclaims were against new Defendants not included in the original Complaint including Raymond Write, Glenda Wright, Asbury Farms, Levi Wright, Hurricane Creek, and Lower Appling County, LLC. Id. at 74-80.

On July 16, 2018, Sunshine Heifers, FNB South, and Plaintiff informed the Court that they had reached a settlement resolving all claims against each other. Dkt. No. 95. On September 24, 2018, the Court approved the dismissal with prejudice as to claims between and among Plaintiff, Sunshine Heifers, and FNB South. Dkt. No. 123. On November 15, 2018, Sunshine Heifers informed the Court that it had entered into a settlement with the remaining Defendants, which resolved its remaining claims, and the following

---

[9] See supra note 2.

AO 72A
(Rev. 8/82)

day, the Court approved the dismissal with prejudice of Sunshine Heifers's remaining claims. Dkt. Nos. 129-130. As a result of these settlements, Sunshine Heifers is no longer a party to the case, all claims against FNB South in the original Complaint and the Crossclaims have been resolved (Counts Three, Five, Six, Seven, Eight, Nine, Ten, and Eleven in the original Complaint and Crossclaim Counts III, IV, V, and VII), Counts Five and Nine in the original Complaint and Crossclaim Count VII (incorrectly listed as Count VIII) are moot, and Pete Wright and WFD's Motion for Summary Judgment against Sunshine Heifers claims, dkt. no. 102, is moot.

Additionally, Plaintiff filed a motion for default judgment against LACH for failure to appear and respond in this case on August 30, 2018. Dkt. No. 98. The clerk signed the proposed order for default judgment against LACH, but it noted the order as an entry of default on the Court's docket. Dkt. No. 99. Under Federal Rule of Civil Procedure 55, a party may seek an entry of default and, subsequently, a default judgment against another party who has failed to plead or otherwise defend a lawsuit. Rule 55(a). It is a two-step process. "First, the party seeking a default judgment must file [an application] for entry of default with the clerk of a district court by demonstrating that the opposing party has failed to answer or otherwise respond to the complaint, and, second, once the clerk has entered a default, the

15

moving party may then seek entry of a default judgment against the defaulting party." Gladden v. Homewood Florist, Inc., No. 2:09-CV-01547-HGD, 2011 WL 13286008, at *1 (N.D. Ala. July 6, 2011)(alteration in original)(citations omitted); see also Bank of Am., N.A. v. Harris, No. 1:17-CV-1201-CAP-JSA, 2017 WL 8186606, at *3 (N.D. Ga. Nov. 30, 2017), report and recommendation adopted, No. 1:17-CV-1201-CAP, 2017 WL 8186601 (N.D. Ga. Dec. 20, 2017) (describing the "two-step procedure for obtaining a default judgment"). Here, Plaintiff did not follow the proper procedure by prematurely filing a motion for default judgment before filing a motion for default and the clerk incorrectly filed a default judgment before entering default. However, because LACH has never appeared in this case and because the amount owed by LACH to Plaintiff is a sum certain—$182,798.29—the Court enters **DEFAULT JUDGMENT** against LACH in that sum certain amount.

Therefore, currently at issue before the Court are Pete Wright's Motion for Summary Judgment, dkt. no. 100, WFD's Motion for Summary Judgment, dkt. no. 101, and WPW's Motion for Summary Judgment, dkt. no. 103. These motions request summary judgment on all counts of the Complaint and the crossclaims. Plaintiff's Cross Motion for Partial Summary Judgment is also before the Court. Dkt. No. 104. Plaintiff requests summary judgment on Count One for breach of contract, Count Two for promissory estoppel, and Count Three for unjust enrichment and Crossclaim Count VIII for successor

AO 72A
(Rev. 8/82)

liability. Id. Plaintiff's Motion is only directed at Defendants Pete Wright and WFD. Id. Therefore, this Order will only resolve the parties and claims at issue before it in these four motions. Claims against other Defendants not at issue in these motions are not before the Court, and those claims continue in this case.

## LEGAL STANDARD

Summary judgment is required where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. In making this determination, the court is to view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 507 (11th Cir. 2000).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The movant must show the court that there is an absence of evidence to support the nonmoving party's case. Id. at 325. If the moving party discharges this

burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. Anderson, 477 U.S. at 257.

The nonmovant may satisfy this burden in two ways. First, the nonmovant "may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was 'overlooked or ignored' by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence." Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1116 (11th Cir. 1993) (quoting Celotex Corp., 477 U.S. at 332 (Brennan, J., dissenting)). Second, the nonmovant "may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1117. Where the nonmovant attempts to carry this burden instead with nothing more "than a repetition of his conclusional allegations, summary judgment for the [movant is] not only proper but required." Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981) (citing Fed. R. Civ. P. 56(e)).

## DISCUSSION

### I. Contract Related Claims and Liability

#### A. Breach of Contract

Plaintiff and Defendants have filed cross motions for summary judgment on Plaintiff's claim of breach of contract against WFD. Plaintiff argues that the record supports all of the elements of

a breach of contract claim and asserts that the amount owed to Plaintiff under the contract that it had with WFD is not in dispute. Defendants argue that Plaintiff's claim fails because Plaintiff has been paid in full for the contract between WFD and Plaintiff out of the $75,000 settlement between Plaintiff, Sunshine Heifers, and FNB South. Moreover, Defendants contend that to the extent Plaintiff disputes that it has been paid in full, a material dispute of fact exists as to how the proceeds from the $75,000 settlement are to be applied.

In Georgia, the elements of a breach of contract claim are "(1) a valid contract; (2) material breach of its terms; and (3) damages arising therefrom." Brooks v. Branch Banking & Tr. Co., 107 F. Supp. 3d 1290, 1295 (N.D. Ga. 2015) (citation omitted). "To constitute a valid contract, there must be parties able to contract, a consideration moving to the contract, the assent of the parties to the terms of the contract, and a subject matter upon which the contract can operate." O.C.G.A. § 13-3-1 (2018).

First, Pete Wright, acting by or through WFD as the owner and managing member, was the buyer, and Plaintiff was the seller. Second, the consideration in this case was an exchange of cattle sent in loads from Plaintiff's farm in North Carolina to WFD's dairy property in Georgia in exchange for payment by WFD. Specifically for WFD, it is undisputed based on invoices in the record that WFD purchased two loads of cattle from Plaintiff on or

19

around February 2, 2017, for $16,775.00 and on June 5, 2017, for $96,800.00. This money—along with the balance owed by LACH—was to be to be paid out of milk check assignments from an account with Maryland and Virginia Milk Producers Cooperative, Inc. This milk check assignment originated with LACH but was changed to WFD after WFD took over LACH's milking operations once the lease with LACH was terminated. Other money was paid directly from Pete Wright to Plaintiff (for LACH's debts), see dkt. no. 104-10 at 2 (showing a payment of $17,000 on August 22, 2017), and a payment of $68,000 was paid to Plaintiff on WFD's behalf from the Gutman sale, dkt. no. 104-2 at 22, 37.[10] Moreover, WFD accepted the deliveries of cattle from Plaintiff, and Plaintiff accepted WFD's payments. These payments and the acceptance of the cattle deliveries, along with other documentary evidence of the invoices and statements of accounts, demonstrate the Parties' assent to the terms of the contract—delivery in exchange for payment via milk assignment—and the subject matter of that contract—the purchase of cattle. Thus, the Court finds that Plaintiff and WFD had a valid contract.

Plaintiffs argue that WFD breached this contract by not paying fully for the cattle. Defendant does not dispute this assertion, but instead, argues that any payment obligation owed by WFD to Plaintiff has been fulfilled. First, it is undisputed that WFD's

---

[10] Neither of these payments changed the undisputed balance owed by WFD of $44,950.97 or by LACH of $182,798.29, which were calculated after these payments were made to Plaintiff.

AO 72A
(Rev. 8/82)

statements of account shows that WFD owed $44,950.97 to Plaintiff for the cattle in September of 2017. The record demonstrates that WFD has not paid Plaintiff this remaining amount. However, Defendants argue that this payment obligation has been satisfied by a $75,000 payment to Plaintiff out of the settlement with Sunshine Heifers and FNB South. Defendants believe that this $75,000 payment should be credited to WFD's debt because WFD sold its remaining cattle on October 6, 2017, in the Final Cattle Sale, and they allege that the $75,000 settlement money was distributed from the proceeds of that cattle sale.

However, despite the fact that Plaintiff admits the $75,000 came from the trust account that contained the funds from the Final Cattle Sale, dkt. no. 118-1 ¶ 69, Defendants have not pointed to any evidence in the record to establish that the $75,000 settlement payment fulfills WFD's contractual debt to Plaintiff. The trust account holding that money included funds owed to Sunshine Heifers and FNB South. Plaintiff, FNB South, and Sunshine Heifers disputed how much each of the three parties were entitled to from the trust account. Additionally, Plaintiff had claims against FNB South and counterclaims against Sunshine Heifers that included tort claims. Thus, to meet their burden Defendants would have to show that despite these facts, evidence in the record shows that the $75,000 in the settlement payment came from funds that WFD owed to Plaintiff, not funds owed to FNB South or Sunshine Heifers. From

21

the standpoint of the moving party in their Motion for Summary Judgment, without pointing to any evidence in the record, Defendants fail to show the absence of a genuine issue of material fact that the $75,000 settlement covers WFD's debts to Plaintiff under the breach of contract claim. From the standpoint of the non-moving party responding to Plaintiff's Motion for Summary Judgment, Defendants fail to point to evidence in the record that creates a genuine issue of material fact as to Plaintiff being paid in full under the contract. Thus, the Court finds that Plaintiff and WFD had a contract, WFD breached that contract through non-payment, and Plaintiff has suffered damages in the remaining balance of $44,950.97 as evidenced by the statement of account.

Therefore, with respect to Count One against WFD, Plaintiff's Motion, dkt. no. 104, is **GRANTED** and Defendant WFD's Motion, dkt. no. 101, is **DENIED**. Because Plaintiff has an adequate remedy at law under Count 1 for breach of contract, the Parties' Motions with respect to Count 2 for promissory estoppel and Count 3 for unjust enrichment are hereby **DENIED** as **MOOT**.

### B. Successor Liability

Next, the Court must consider whether Plaintiff can also hold WFD liable for LACH's liability for its debt to Plaintiff for its breach of contract. In its Motion for Summary Judgment, Plaintiff argues that WFD should be held liable for the debts of LACH under

AO 72A
(Rev. 8/82)

a theory of successor liability as pled in Count VIII of the Cross Claim. Specifically, Plaintiff argues that WFD is a successor in interest to LACH because it either agreed to assume the liabilities of LACH or because it functioned as a mere continuation of LACH. Default Judgment has now been entered against LACH in the amount of $182,798.29 in this case. Defendants argue that WFD never explicitly agreed to assume LACH's liabilities and any such agreement must have been in writing under the Statue of Frauds. Moreover, Defendants argue WFD cannot be a mere continuation of LACH because WFD never purchased LACH or any of its assets and because the two companies were in a landlord-tenant relationship which is inapplicable to the doctrine of successor liability.

Under Georgia law, "[o]rdinarily, a successor entity does not assume the liabilities of its predecessor unless '(1) there is an agreement to assume liabilities; (2) the transaction is, in fact, a merger; (3) the transaction is a fraudulent attempt to avoid liabilities; or (4) the [successor] is a mere continuation of the predecessor corporation." Dan J. Sheehan Co. v. Fairlawn on Jones Condo. Ass'n, Inc., 780 S.E.2d 35, 38 (Ga. Ct. App. 2015) (citations omitted) (alteration in original). Plaintiff argues that WFD is a successor in liability to LACH under either the first or fourth exception.

Turning to the first exception, where there is an agreement to assume liabilities, Plaintiff has failed to show an agreement

between WFD and LACH under which WFD would assume LACH's liabilities. Under the Georgia Statute of Frauds, O.C.G.A. § 13-5-30(2) (2018), "a promise to answer for the debt, default, or miscarriage of another" must be in writing. Plaintiff argues that this agreement is evidenced by the agreement concerning WFD's termination of its lease with LACH, but nothing in the lease or testimony about the termination of that lease reveals an agreement for WFD to assume LACH's liability. See Dkt. No. 104-2 at 18; Dkt. No. 104-3 at 71. Next, Plaintiff argues that the agreement is evidenced by the milk-check assignment to the Plaintiff by WFD. While the milk check assignment could be considered a "writing" for purposes of the Statute of Frauds, it is not sufficient, on its own, to show an agreement to assume liability. First, the assignment could be terminated by WFD at any time—and was in fact terminated—which suggests that this document does not demonstrate an all-encompassing agreement to assume liability. Moreover, despite Pete Wright's testimony that the milk-check assignment was to pay for LACH's debt to Plaintiff, WFD also owed money to Plaintiff at this point, so it is not clear that this milk check assignment was an agreement to pay LACH's debts instead of merely an attempt to pay WFD's debt. Ultimately, while the fact that WFD may have made the milk check assignment to pay off part of LACH's debt to Plaintiff, the Court cannot say that this document on its

own is an agreement to assume the liabilities of LACH as a matter of law.

As to the fourth exception, it refers to "the common law doctrine of corporate continuity [, which] applies where ... there is a substantial identity of ownership and a complete identity of the objects, assets, shareholders, and directors." Dan J. Sheehan Co., 780 S.E.2d at 38 (alteration in original); see T.V.D.B. Sarl v. Kapla USA, LP, No. 4:12-CV-230, 2013 WL 6623186, at *9 (S.D. Ga. Dec. 16, 2013) (quoting Copeland & Assocs., Inc. v. Tag Poly Bags, Inc., 267 S.E.2d 862, 863 (Ga. Ct. App. 1980)) ("An entity 'is but a continuance of the old' entity 'by reason of such identity of name, objects, assets, and stockholders.'" (citation omitted)). "The identity need not be complete; only 'some identity of ownership' is necessary to apply the successor-in-interest theory." T.V.D.B., 2013 WL 6623186, at *9. "The corporate continuity doctrine is one of equity." Dan J. Sheehan Co., 780 S.E.2d at 38.

This Court finds the reasoning of the court in T.V.D.B. Sarl v. Kapla USA, LP to be persuasive and instructive on the facts of this case. 2013 WL 6623186, at *9-*10. In T.V.D.B., the court found that one company, CITIBLOCS, LLC ("CITIBLOCS"), was a successor in interest to another separate company, KAPLA USA, LP("KAPLA"), based primarily on that fact that one individual, Chayette, was "at the heart of both ventures." Id. at *9. Chayette

25

was the founding member of KAPLA, which was formed first, and eventually became a member of CITIBLOCS. Despite the fact that CITIBLOCS was its own independent company that did not merge with, purchase, or take over KAPLA, the court found a variety of factors that made the former a continuance of the latter: both companies made the same type of children's blocks toys, Chayette held herself out as a member of CITIBLOCS—despite not yet being one—and used KAPLA's name on a credit application for CITIBLOCS, the entities used the same bank accounts, some of the same employees worked for both companies (some even doing so simultaneously), the companies used the same mailing address, the founding member of CITIBLOCS sold KAPLA's inventory and received payment from CITIBLOCS for those sales, and KAPLA transferred at least $30,000 to CITIBLOCS to fund its start-up. Id. at *1, *9-10. Based on these facts, the court held that "[n]early all signs point to CITIBLOCS as being a continuation of and successor in interest to KAPLA." Id. at *9.

For many of the same reasons that the court found successor liability in T.V.D.B., WFD is also a continuation and successor in interest to LACH in this case. Like Chayette in T.V.D.B., Pete Wright was "at the heart of" both WFD and LACH. Although he was not a member of LACH, he was in charge of all of LACH's finances (even to the point that Raymond Wright, the sole member of LACH, was unaware of the financial decisions and transfers Pete Wright was making), and Pete Wright appears to have held himself out as

26

a member of LACH to Plaintiff, when he went on behalf of LACH to purchase cattle from Plaintiff, and the bank, who both thought they were always dealing with Pete Wright whether through WFD or LACH, see dkt. no. 104-8 at 7; 104-9 at 6-8.[11] Pete Wright also transferred money from LACH to WFD, and he took money from LACH and transferred it directly to himself, like the money transfer in T.V.D.B. Moreover, WDF and LACH had the same address, had possession of the same milking-operation assets on the same property, utilized some of the same employees (who worked for both companies simultaneously), and Pete Wright paid off WFD's debts with income from LACH's operations—this in addition to WFD paying the milk assignment to Plaintiff on behalf of LACH's debt. After the settlement between LACH and WFD, WFD retained all of the equipment used by LACH and took over all of LACH's cattle to continue the milking operation. Finally, testimony in the record shows that LACH was set up to provide revenue to WFD from milking operations while protecting assets and money from WFD's numerous creditors and liens. The Court finds that based on these facts, a substantial identity of ownership exists between WFD and LACH with "the similarity of the names being the only incompleteness."

---

[11] Moreover, the fact that Pete Wright was not a member of LACH is not dispositive because the issue is whether the two entities, not the members of those entities, are successor in interest. As an example, the court in T.V.D.B. found facts supporting successor liability involving Chayette's actions before she became a member of CITIBLOCS. 2013 WL 6623186 at *9.

AO 72A
(Rev. 8/82)

T.V.D.B., 2013 WL 6623186, at *10. As such, Plaintiff can hold WFD liable for LACH's liability under the contract with Plaintiff.

Defendant argues that WFD cannot be a mere continuation of LACH because they had a landlord-tenant relationship and because there was no "purchase" under the rule. First, the Court does not hold that WFD is a successor in interest of LACH based on their landlord-tenant relationship. Rather, the Court's holding is based on the numerous facts demonstrating a common identity of ownership between the two entities, with Pete Wright's involvement in both as the most compelling factor. Second, while the language of the rule for the mere continuation exception uses the term "purchase" in regard to corporations, a purchase is not required to apply the equitable doctrine of corporate continuity. See T.V.D.B., 2013 WL 6623186, at *9-10 (finding continuity for an LLC and an LP despite the lack of a purchase); see also Dan J. Sheehan Co. v. Fairlawn on Jones Condo. Ass'n, Inc., 780 S.E.2d 35, 38 (Ga. Ct. App. 2015) (finding continuity between two associations despite the lack of a purchase). Additionally, in T.V.D.B., the Court rejected the defendants' argument that there was no successor liability because there was an absence of a transfer of stock between the two companies. 2013 WL 6623186, at *9. Thus, Defendant has failed to show a genuine dispute of material fact as to why successor liability does not apply in this case to WFD. As a result, Plaintiff can hold WFD liable for its own breach of

AO 72A
(Rev. 8/82)

contract as well as the $182,798.29 default judgment entered against LACH in this case for its debts to Plaintiff. Plaintiff's Motion for Partial Summary Judgment with respect to Cross Claim Count VIII for claims against WFD and LACH is hereby **GRANTED**.[12]

### C. Piercing the Corporate Veil

The Court must also determine whether Plaintiff can hold Pete Wright personally liable for the debts of WFD—which also includes the debts of LACH under a theory of successor liability—under a theory of piercing the corporate veil. The Court will first determine whether Plaintiff raised the theory of veil-piercing in the pleadings. Second, finding that the theory was raised, the Court will determine the merits of the veil-piercing argument.

### i. Did Plaintiff Raise Veil-Piercing in the Complaint?

In this case, Plaintiff attempts to hold Pete Wright liable for the debts of WFD—which as a result of successor liability discussed above includes the debts of LACH—under a theory of piercing the corporate veil. In response, Defendants argue that Plaintiff never raised the doctrine of veil-piercing in either the Complaint or the Cross Claims but was instead improperly raised for the first time in Plaintiff's Motion for Summary Judgment.

---

[12] Plaintiff's Motion for Partial Summary Judgment is only directed at Defendants WFD and LACH with respect to Crossclaim Count VIII. Moreover, Defendants' Motions for Summary Judgment are filed on behalf of Pete Wright, WFD, and WPW. For WPW's liability, see infra Section V. As for the remaining Defendants under Crossclaim Count VIII beyond WFD and LACH, claims against those Defendants remain undisturbed by this Order.

Defendants correctly note that a Complaint must be amended in accordance with Federal Rule of Civil Procedure Rule 15 and motions for summary judgment or responses thereto are inappropriate vehicles to raise new claims. See, e.g., American Federation of State, County and Mun. Employees Council 79 v. Scott, 717 F.3d 851, 863 (11th Cir. 2013) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment or one advocating summary judgment.") (citation and internal quotation marks omitted); GeorgiaCarry.Org, Inc. v. Georgia, 687 F.3d 1244, 1258 n.27 (11th Cir. 2012) ("It is well-settled in this circuit that a plaintiff may not amend the complaint through argument at the summary judgment phase of proceedings."). However, "[t]echnically 'piercing the corporate veil' is not a claim but a means by which [a plaintiff] might hold" individual defendants liable for a corporate entity's misconduct. GEBAM, Inc. v. Inv. Realty Series I, LLC, 15 F. Supp. 3d 1311, 1313 (N.D. Ga. 2013); see also RehabCare Grp. E., Inc. v. SAK Mgmt. Servs., LLC, No. 09 C 4523, 2010 WL 3307084, at *5 (N.D. Ill. Aug. 18, 2010) ("The alter ego theory is not a claim but a procedural mechanism for allowing liability on a substantive claim."). Citing other courts in this Circuit, this Court has previously explained that "a veil-piercing claim or theory of liability must be presented in the plaintiff's pleading in some form or fashion." Pinova, Inc. v. Quality Mill Serv., Inc., No. CV 213-144, 2015 WL 5178946, at *2-

AO 72A
(Rev. 8/82)

3 (S.D. Ga. Sept. 3, 2015) (emphasis added) (quoting <u>Northstar</u> <u>Marine, Inc. v. Huffman</u>, No. CIV.A. 13-0037-WS-C, 2014 WL 4854843, at *9 (S.D. Ala. Sept. 29, 2014)).

Given the liberal standard of notice pleading, the Court finds that, despite not using the term "piercing the veil," Plaintiff did raise the theory of liability in the Complaint and the Crossclaims such that Defendants were on notice that Plaintiff would attempt to hold Pete Wright liable as the alter ego of WFD. See <u>Gonzalez v. Asset Acceptance, LLC</u>, 308 F. App'x 429, 430 (11th Cir. 2009) ("The purpose of Fed. R. Civ. P. 8(a)(2) is to provide the defendant with fair notice of what claim is being alleged, and the grounds upon which it rests."). First, as a general matter, the Complaint and the Crossclaims detail Pete Wright's involvement in the facts of this case (namely his involvement with various business entities surrounding his milking operations and with the specific sale of cattle at issue in this case), and Plaintiff sues Pete Wright as doing business as WFD and includes him under the label of "The Wright Defendants." This Court has previously held that this fact alone—being lumped in a group of "Defendants" with corporate entities—is not enough to raise the theory of veil-piercing. <u>Pinova</u>, 2015 WL 5178946, at *3 ("Simply stating that 'Defendants' sold Pinova the chains and that 'Defendants' knew how Pinova intended to use the chains does not allege that Quality Industries was abusing the corporate form by using Quality Mill as

31

an alter-ego or sham corporation."). But, here, Plaintiff also alleged in Crossclaim Count VIII that "these corporations [referring to WFD and others] have at various times functioned as alter-ego of one another or of Pete Wright." Dkt. No. 65 ¶ 320. Therefore, Defendants were on notice that Plaintiff alleged Pete Wright was the alter ego of WFD. This fact combined with the facts alleged in the pleadings such as Pete Wright's involvement with WFD and that he entered into a transaction with Plaintiff to provide cattle for WFD—an LLC of which he was the managing member—were sufficient to raise the doctrine of veil-piercing to put Defendants on notice of that theory.[13]

### ii. Do the Facts Support Piercing the Corporate Veil Against Pete Wright?

After establishing that Plaintiff did raise the theory of piercing the corporate veil, the Court now turns to the merits of that theory.[14] "Under Georgia corporate law, individual shareholders and officers of a corporation are 'shielded by the corporate veil,' in the absence of fraud or abuse of the corporate form." Dearth v. Collins, 441 F.3d 931, 934-35 (11th Cir. 2006)

---

[13] Moreover, Plaintiff also asserted that Pete Wright was not protected by the corporate form for alleged torts he committed involving WFD, which, while involving a separate theory of liability, shows Plaintiff noting Pete Wright's relationship to the corporate form of his business entities in the pleadings. Dkt. No. 1 ¶ 118; Dkt. No. 65 ¶¶ 247, 257. This fact furthers the view that the pleadings put Defendants on notice of a possible piercing the corporate veil theory of liability.

[14] Defendants only presented argument on the issue of whether Plaintiff properly raised the veil-piercing doctrine; they did not present any argument on the merits of Plaintiff's veil-piercing theory.

(quoting <u>Moore v. Barge</u>, 436 S.E.2d 746, 749 (Ga. Ct. App. 1993)). However, this "corporate veil" can be pierced under the "alter ego doctrine" if a plaintiff can establish the doctrines three requirements: (1) that the stockholders' disregard of the corporate entity made it a mere instrumentality for the transaction of their own affairs; (2) that there is such unity of interest and ownership that the separate personalities of the corporation and the owners no longer exist; and (3) to adhere to the doctrine of corporate entity would promote injustice or protect fraud." <u>Id.</u> (quoting <u>McLean v. Cont'l Wingate Co.</u>, 442 S.E.2d 276, 279 (Ga. Ct. App. 1994). While "[t]he doctrines of limited liability and of piercing the corporate veil are often discussed in terms of corporations," they also "apply to LLCs." <u>Functional Prod. Trading, S.A. v. JITC, LLC</u>, No. 1:12-CV-0355-WSD, 2014 WL 3749213, at *6 (N.D. Ga. July 29, 2014) (citing O.C.G.A. § 14-11-303(a)).

"To justify piercing the corporate veil, 'the plaintiff must show [that] the owner abused the corporate form by disregarding the separateness of legal entities by commingling [funds] on an interchangeable or joint basis or confusing the otherwise separate properties, records, or control.'" <u>Id.</u> (quoting <u>Rasheed v. Klopp Enters., Inc.</u>, 622 S.E.2d 442, 446 n.4 (Ga. Ct. App. 2005)). To justify piercing the corporate veil under Georgia law, "[g]enerally, there must be evidence that the corporate owner used corporate funds for personal expenses; or that the owner bled or

AO 72A
(Rev. 8/82)

siphoned the assets of the debtor corporation to another corporation that the owner controls; or that the owner passed the owner and the owner's corporations off to third parties as single entity. Manhattan Constr. Co. v. Phillips, No. 1:09-CV-1917-WSD, 2012 WL 13001890, at *11 (N.D. Ga. Apr. 9, 2012)(citations omitted), aff'd sub nom. Manhattan Const. Co. v. Place Properties LP, 559 F. App'x 856 (11th Cir. 2014). Finally, although the determination of veil-piercing is "typically one to be resolved at trial" given its "fact-intensive" nature, "a court may grant summary judgment if a jury would have but one result." Smith v. Georgia Energy USA, LLC, No. CV 208-020, 2014 WL 5643919, at *4 (S.D. Ga. Nov. 4, 2014).

Based on the undisputed facts of this case, the Court finds that a jury would have but one result—finding that Plaintiff could pierce the corporate veil of WFD to hold Pete Wright liable for WFD's debts to Plaintiff. Here, the key factors for piercing the corporate veil under Georgia law are all present. Plaintiff has demonstrated from the record that this case is one of the rare cases where a member of an LLC is not entitled to protection from the corporate veil.

First, the evidence demonstrates that Pete Wright disregarded the corporate entity of WFD such that WFD was a mere instrumentality for his own affairs. As for WFD's business generally, while it is possible that WFD might have been initially

AO 72A
(Rev. 8/82)

set up and run as a legitimate corporate entity, the evidence shows that as WFD's debts piled up, Pete Wright set up other entities like LACH to continue receiving milking revenue while avoiding paying WFD's creditors. Raymond Wright testified that LACH was set up to continue the dairy operations on the dairy farm owned by WFD and to send revenue to WFD while protecting that revenue from WFD's creditors. Additionally, Pete Wright set up an entity called Asbury Farm, and he admitted that after selling cattle from WFD (after acquiring them from LACH) to New Holland, he directed New Holland to send those funds to Asbury Farm to avoid WFD's creditors and "hide" the money. Dkt. No. 104-2 at 55. More broadly, when asked under oath whether he created Asbury Farm to in an effort to move assets to Asbury Farm out of WFD and to liquidate those assets to receive proceeds, Pete Wright asserted the Fifth Amendment right against self-incrimination.[15]    These actions involving other

---

[15] The Court makes an adverse inference against Pete Wright for his assertion of the Fifth Amendment in response to the deposition questions about WFD's assets and Asbury Farm for the purposes of this veil-piercing inquiry.   The Eleventh Circuit has held that "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them." United States v. Premises Located at Route 13, 946 F.2d 749, 756 (11th Cir. 1991), as amended (Nov. 5, 1991) (citations omitted). Although an exception to this rule applies where "a person, who is a defendant in both a civil and a criminal case, is forced to choose between waiving his privilege against self-incrimination or losing the civil case on summary judgment," that exception does not apply here for two reasons: the Court is not aware of any pending criminal case against Pete Wright and this adverse inference alone is not dispositive on the issue of veil-piercing or summary judgment overall. Thus, the Court can properly make an adverse inference at this juncture. See United States v. Marder, 208 F. Supp. 3d 1296, 1305 (S.D. Fla. 2016) (making an adverse inference against a defendant for asserting the Fifth Amendment privilege in response to deposition questions in deciding a summary judgment motion).

AO 72A
(Rev. 8/82)

business entities to protect WFD's money and other assets from creditors are an example of WFD and Pete Wright abusing the corporate form to avoid WFD's monetary obligations for his own financial gain. See Baillie Lumber Co. v. Thompson, 612 S.E.2d 296, 299 (Ga. 2005) ("The concept of piercing the corporate veil is applied in Georgia to remedy injustices which arise where a party has over extended his privilege in the use of a corporate entity in order to . . . evade contractual or tort responsibility." (emphasis added)).

Additionally, other facts show how Pete Wright abused the corporate form of WFD. Pete Wright was the managing member of WFD and was in charge of the finances for LACH. In those capacities, he made multiple money transfers between LACH, WFD, and himself. In one example, there was a transfer of $2,200 from LACH to WFD, and on that same day, someone[16] wrote a check of $2,200 from WFD's account to a paint and body shop for repairs on Pete Wright's personal vehicle.[17] Dkt. No. 104-2 at 41. Harvey Prater also wrote a check from WFD to pay for Pete's speeding ticket fine.

---

[16] The check was signed by W.P. Wright, but Pete Wright testified it was written by his office manager Harvey Prater.

[17] Although it is true that the lease agreement between LACH and WFD included a provision that LACH would provide Pete Wright a pick-up truck and maintenance costs, the point of this fact and this paragraph is that Pete Wright, in his position as managing member of WFD and head of finances for LACH, abused the corporate form by transferring money in various ways between WFD, LACH, and his own personal bank accounts. Indeed, even if the transfer here was for the truck provided for in the lease, the money was still transferred from LACH's account to WFD's account before a check was written for the truck repair—demonstrating an example of comingling funds. Moreover, the record is not clear as to whether the truck referred to in the lease is the truck that Pete Wright had repaired.

AO 72A
(Rev. 8/82)

Dkt. No. 104-2 at 45. In another example, there was a transfer of $2,150 from LACH to WFD, and on the same day, WFD wrote a check to Dixie Farms. Dkt. No. 104-2 at 41. Pete Wright testified that this was an example of him using LACH to pay off WFD's debts. Moreover, Pete and Glenda Wright would transfer money from LACH to WFD, then transfer to their personal accounts, and then pull out cash or write cashier's checks to make various payments, including to their creditors. These multiple transfers between WFD, LACH, and Pete Wright's personal accounts made bookkeeping the records "very difficult," dkt. no. 104-6 at 10, such that in his deposition, Pete Wright could not identify for what purposes large transfers to WFD or from WFD to himself were being made. See, e.g., Dkt. No. 104-2 at 40-4. Glenda Wright admitted that during 2016, she and Pete wired roughly $200,000 to their personal bank account from WFD and LACH and then would wire money from that personal account to creditors. All in all, these facts show that Pete Wright used WFD's business account to pay his personal expenses and that he mixed that account with his personal account and LACH's account in paying WFD's creditors such that he was comingling WFD's business funds with his own personal funds. These facts show a total disregard of the corporate entity of WFD.

Second, the facts of this case show a unity of interest and ownership between Pete Wright and WFD that essentially eliminate the separate personalities of the two entities. In addition to

AO 72A
(Rev. 8/82)

the comingling of WFD's bank accounts with his personal accounts, Pete Wright also owned all of the dairy property and assets, and he held himself out to others as a single entity with WFD. Pete Wright's residence, WFD's principal office and farming operation, and LACH's principal office and farming operation were all located at the same address—the Dairy Property. While the fact that Pete Wright lives and operates a business on the same property is not enough on its own to pierce the veil, this fact shows the milking operation assets were always on Pete Wright's land. When Pete Wright would interact with third parties regarding the milking operation on his land, even if he was doing so as WFD or LACH, third parties testified that they believed they were doing business with Pete Wright personally. Robert Stamey testified that he understood Pete Wright to be the purchaser of his cows, and he went so far as to say that "if Pete Wright hadn't been the buyer, not one of these [cows] would have been put on a truck headed to Georgia." Dkt. No. 104-9 at 7. Furthermore, a representative from the bank, FNB South, affirmed during deposition testimony that from the bank's perspective, regardless of what corporate entity it was, they considered themselves to be dealing with Pete Wright. Dkt. No. 104-8 at 7. These facts show that based on Pete Wright's conduct, the line between WFD and himself had been blurred to the point that they could be considered one and the same.

AO 72A
(Rev. 8/82)

Third, and finally, allowing Pete Wright to avail himself of the protection of the corporate form would promote an injustice in this case. As of now, WFD has been dissolved and has ceased business operations, and the dairy property has been foreclosed. Additionally, WFD was at one-time subject to a tax lien and various other debts, and to the court's knowledge based on the record, those debts still exist. Thus, if the Court, despite Pete Wright's disregard of the corporate form, were to allow him to maintain the protection of the corporate veil, Plaintiff would likely have no means of recovery since WFD and LACH are now dissolved and have been insolvent since at least the time of the final delivery of cattle. See Dkt. No. 117 ¶ 19 (admitting that WFD and LACH were insolvent at the time of the June 5, 2017 delivery); see also Rapp v. Escante, Inc., 695 S.E.2d 744, 746 (Ga. Ct. App. 2010) ("A debtor who generally is not paying his debts as they become due is presumed to be insolvent."). Thus, in order to promote a just and equitable outcome, in light of the facts discussed above, the Court holds that Plaintiff may pierce the corporate veil of WFD and hold Pete Wright personally liable for the LLC's contractual debts.[18]

---

[18] Plaintiff also asks the Court to pierce the veil against Pete Wright and LACH. However, it is undisputed that Raymond Wright was the sole member of LACH, and the record is unclear as to whether Pete Wright could be considered a manager of LACH subject to potential liability for LACH's debts under a veil-piercing theory. Pete Wright managed all the finances of LACH in some sort of supervisory capacity, but Raymond Wright did not provide a clear answer when asked whether Pete Wright was a "manager" of LACH. Thus, at the very least this is a factual issue. However, in light of the Court's findings that WFD is a successor in interest to LACH and that Plaintiff can pierce the veil against Pete Wright for WFD's contractual liabilities, Pete Wright would also be liable

AO 72A
(Rev. 8/82)

Therefore, Plaintiff's Motion with respect to Count One against Pete Wright is **GRANTED**, and Pete Wright's Motion with respect to Count One is **DENIED**. Pete Wright's Motion as to Counts Two and Three is **DENIED** as **MOOT**.

## II. Security Interest and Related Claims

Plaintiff asserts that it had a security interest of some kind in the cattle sold to Defendants in several counts and crossclaims in this case. See Counts Six and Seven and Crossclaim Counts Two, Three, Four, Five, and Six. In response, Defendants' argue that Plaintiff was merely an unsecured creditor that possessed no such security interest in the cattle.

The attachment and enforceability of security interests is governed by Article 9 of the U.C.C., which is adopted under Georgia law in O.C.G.A. § 11-9-203, et. seq. Art. 9 provides that "[t]hree conditions must be met before a security interest is enforceable against anyone." In re Pierce, 581 B.R. 912, 917 (Bankr. S.D. Ga. 2018) (citing O.C.G.A. § 11-9-203(b)). "First, unless the secured party possesses the collateral, there must be a written security agreement signed by the debtor and containing a description of the collateral. Second, the secured party must have given value to the debtor. And third, the debtor must have 'rights in the collateral.'" Id. (quoting O.C.G.A. 11-9-203(b)); see also Grier

---

for WFD's successor liability of LACH. In other words, the issue of veil-piercing for Pete Wright as to LACH is likely moot at this point.

AO 72A
(Rev. 8/82)

v. Skinner's Furniture Store of Newnan, Inc., 349 S.E.2d 826, 828 (Ga. Ct. App. 1986) ("A signed security agreement is an absolute requisite to the enforceability of the security interest." (citations omitted) (internal quotation marks omitted)).

In this case, it is undisputed that Plaintiff did not have possession of the cattle that it claims a security interest in; thus, Plaintiff would have to show evidence of a security agreement signed by Defendants. A security agreement is "an agreement that creates or provides for a security interest." O.C.G.A. § 11-9-102(a)(72) (2018). This agreement must be authenticated with a signature by the party against whom it is to be enforced in accordance with the Statute of Frauds. See id. § 11-9-102(a)(7) (defining "authenticate"); In re Flager, Jr., No. 07-50293-JDW, 2007 WL 1701812, at *2-3 (Bankr. M.D. Ga. June 8, 2007) (Thus, the need for authentication imposes "an evidentiary requirement in the nature of a Statute of Frauds." (quoting U.C.C. § 9-203, cmt. 3)). "A security agreement need not be in any particular form so long as it consists of a writing signed by the debtor that reasonably describes the collateral and includes language evidencing an intent to create a security interest." In re Flager, Jr., 2007 WL 1701812, at *2 (citations omitted) (internal quotation marks omitted).

To support its argument that it had a security interest in the cattle, Plaintiff points to O.C.G.A. § 11-2-401 (2018), which

AO 72A
(Rev. 8/82)

states in part: "[a]ny retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest." Thus, although title passes to the buyer upon delivery of goods, a seller can still retain a security interest in the goods if it reserved title in those goods. See O.C.G.A. § 11-2-401(1)-(2); In re Dippin' Dots Patent Litig., 249 F. Supp. 2d 1346, 1377-78 (N.D. Ga. 2003), aff'd sub nom. Dippin' Dots, Inc. v. Frosty Bites Distribution, LLC, 369 F.3d 1197 (11th Cir. 2004)(explaining that under Article II of the U.C.C., "reservation of title after delivery amounts only to a security interest, and for all other purposes, title passed to [the buyer] at the time of delivery by [the seller]"). In this case, Plaintiff points to invoices and statements of accounts for the seven loads of cattle sold to Defendants that contain the statement "Title will transfer when full payment is received" next to a signature line at the bottom of the pages. Defendant admits that Plaintiff sold the cattle to Defendant on credit, see dkt. no. 118-1 ¶ 32, and while the title reservation language would not allow Plaintiff to retain title after delivery of the cattle, it would be sufficient to retain a security interest in the cattle.

However, two issues arise with these invoices. First, five of the invoices with the reservation language were not signed until October 6, 2017, which was well after the cow sales to Gutman

42

Brothers and others that are basis of Plaintiff's security interest claims. In other words, if these five invoices were sufficient to create a security interest, that interest would not have attached until they were signed on October 6, 2017. But, two other invoices exist in this case—specifically the invoices for cattle loads 2 and 3 that were delivered in February 2017. The second issue is that these two invoices, containing the reservation language, were signed upon delivery in February 2017, which would create a security interest in those two loads of cattle. However, a dispute of material fact exists as to whether those invoices were properly authenticated writings because Defendants claim that the signature on those two invoices is not Pete Wright's. The other five invoices are signed "W.P. Wright, Jr." while the two February invoices are signed "Pete Wright." Pete Wright testified that the only invoices he signed were the five signed on October 6, 2017, and that the signatures on the invoices for loads 2 and 3 were not his signature. Dkt. No. 104-2 at 19-20. Glenda Wright also testified that the signatures on the invoices for loads 2 and 3 were not Pete Wright's signature, Dkt. No. 104-6 at 5, and Harvey Prater testified that he had never seen Pete Wright sign his name "Pete Wright" and that he usually signed it "W.P. Wright," Dkt. No. 119-4.

However, Robert Stamey, who had been doing business with Pete Wright for approximately 40 years, testified that he believed the

AO 72A
(Rev. 8/82)

signatures on the invoices for loads 2 and 3 to be those of Pete
Wright, despite looking different than the signatures on the other
five invoices. He stated that he had "a lot" of other "invoices"
from previous years where Pete Wright signed his name "Pete Wright"
as opposed to "W.P. Wright Jr." Dkt. No. 110-1 at 38-39, 41-42.
Additionally, Pete Wright stated during his deposition testimony
that on at least one occasion, he believed Harvey Prater, Pete
Wright's office manager, signed Pete Wright's name to a check—
demonstrating at least one example of Pete Wright's signature being
signed by someone else on his behalf. Dkt. No. 104-2 at 40.
Moreover, at least twice in the record, Pete Wright's signature
differs from both of the signatures on the load invoices. See
Dkt. No. 104-3 at 32 (signing the Certificate of Verification for
the Response to Plaintiff's First Request for Production of
Documents "William P. Wright Jr."); Dkt. No. 116-1 Ex. W (signing
the lease for WFD and LACH as "William P. Wright").

Viewing these facts in the light most favorable to Plaintiff,
the Court finds that a genuine dispute of material fact exists as
to whether Plaintiff had a security interest in the cattle that it
sold to Defendants. A material dispute of fact exists as to
whether Pete Wright, or someone authorized by him, signed the
invoices for loads 2 and 3 in February 2017. Thus, the Court
cannot determine whether Plaintiff had a security interest in the
cattle based on those two invoices because it cannot determine if

44

they were properly authenticated. If they were not properly authenticated, then Plaintiff would have no security interest, if any, until October 6, 2017, when the other invoices were signed. If they were properly authenticated, then Plaintiff would have a security interest in the cattle[19] as a result of the reservation language signed in the February invoices. However, this issue must be left to the jury.[20] Thus, with respect to claims against WFD and Pete Wright under Count Six and Crossclaim Counts III and V,[21] Defendants' Motions are **DENIED**.

However, because the Court finds that even under a theory of a reservation of title Plaintiff did not retain any ownership or title to the cattle, Plaintiff's claim under Count Seven for civil conversion and Cross Claim Count II for civil conversion, livestock

---

[19] A jury would also have to determine which cattle Plaintiff had a security interest in. It is unclear from the record whether, at this point, it could be determined which cows were from loads 2 and 3 compared to the cows from the other loads for two reasons. First, the record shows that Pete Wright removed one type of identification tags from the cows, and second, the cows have now been sold elsewhere. For the purposes of this Order, the Court will refer to a security interest in "the cattle," knowing that jury would have to determine which exact "cattle" that might be.

[20] Despite this genuine dispute of material fact as to whether Plaintiff possessed a security interest in the cattle, the Court does find that even if a jury finds that Plaintiff has a security interest, the record contains no evidence that would allow a reasonable jury to find that such security interest was perfected. In other words, if Plaintiff had a security interest, it would be an unperfected security interest because Plaintiff did not file a UCC-1 filing statement or pursue any other method of perfecting any alleged security agreement under Art. 9 of the U.C.C.

[21] Crossclaim Count V is for civil conspiracy for tortious interference with a security interest. Defendants' only argument for summary judgment on this count is that Plaintiff had no security interest and had been paid in full. Because the Court has determined that Plaintiff was not paid in full through the $75,000 settlement and because it finds that a genuine dispute of material fact exists as to the issue of Plaintiff's alleged security interest, Defendants have failed to meet their burden for Crossclaim Count V warranting a denial of their summary judgment motions on that count.

AO 72A
(Rev. 8/82)

theft, and theft by deception fail as a matter of law. "To make out a prima facie case, in an action for damages for conversion of personal property, the plaintiff must show title to the property, possession by the defendant, demand for possession, and refusal to surrender the property, or an actual conversion prior to the filing of the suit." Taylor v. Powertel, Inc., 551 S.E.2d 765, 769 (Ga. Ct. App. 2001) (emphasis added) (citations omitted). "A person commits the offense of livestock theft when he unlawfully takes or, being in lawful possession thereof, unlawfully appropriates any livestock of another with the intention of depriving the owner of such livestock." O.C.G.A. § 16-8-20 (2018) (emphasis added). "A person commits the offense of theft by deception when he obtains property by any deceitful means or artful practice with the intention of depriving the owner of the property." O.C.G.A. § 16-8-3 (2018) (emphasis added).

Although a jury could find that Plaintiff had a security interest in the cattle based off of the reservation language in the two February 2017 invoices, that language does not allow Plaintiff to also retain title. Under O.C.G.A. § 11-2-401, the default rule is that title passes upon delivery. Therefore, despite the possibility of a security interest, "[i]n no event . . . may a seller retain title after the delivery of the goods, despite an explicit reservation of title." In re Jones, No. 12-14608, 2013 WL 1092099, at *4 (Bankr. E.D. Tenn. Jan. 17, 2013)

46

(discussing O.C.G.A. § 11-2-401). Plaintiff argues that the fact that Pete Wright told Plaintiff to come get the cattle when he realized that he would not be able to pay for them is evidence that Plaintiff maintained ownership or title of the cattle. However, while this fact may be evidence of a creditor-debtor relationship or possibly a security interest, it does not change the fact that Plaintiff sold and delivered cattle to Defendants at which point title transferred to Defendants. Thus, because Plaintiff did not retain any title to the cattle in this case, even with the reservation language, Plaintiff cannot show title or ownership to the cattle and his conversion and theft claims must fail. Defendants' Motions with respect to Count Seven and Crossclaim Count II are **GRANTED**.

Finally, because the underlying individual claims for civil conversion, livestock theft, and theft by deception fail due to Plaintiff's lack of title or ownership in the cattle, Plaintiff's claim under Crossclaim Count IV for Civil Conspiracy: Civil Conversion, Livestock Theft, and Theft by Deception must also fail. Defendant's Motions with respect Crossclaim Count IV are **GRANTED**.

### III. Fraud Claims

#### A. Fraud and Fraud in the Inducement

Plaintiff also brings claims against Defendants for fraud and fraud in the inducement, arguing that Defendants entered into a contract with Plaintiff to purchase cattle with the intent to not

47

pay for those cattle. Defendants respond by arguing that a promise to pay in the future and a failure to pay does not amount to fraud.

"The tort of fraud [including fraudulent inducement][22] has five elements: a false representation by a defendant, scienter, intention to induce the plaintiff to act or refrain from acting, justifiable reliance by plaintiff, and damage to plaintiff." Stafford v. Gareleck, 769 S.E.2d 169, 173 (Ga. Ct. App. 2015) (alteration in original) (citation omitted). "Generally, fraud in Georgia is not actionable if it arises from a failure to fulfill promises to perform acts in the future." Tr. v. O'Connor, No. 1:10-CV-1438-AT, 2012 WL 12836517, at *8 (N.D. Ga. Sept. 28, 2012). This fact is especially "true of a promise to pay money" because "[o]therwise any breach of contract would amount to fraud." Georgia Real Estate Comm'n v. James, 262 S.E.2d 531, 533 (Ga. Ct. App. 1979). However, Georgia recognizes an exception for "promises made with a present intention not to perform or where the promisor knows that the future event will not take place." Tr., 2012 WL 12836517, at *8 (quoting Georgia Real Estate Comm'n, 262 S.E.2d at 533).

The Eleventh Circuit has explained that "[b]ecause fraud in itself is by nature subtle and often difficult to prove, the

---

[22] "Fraud in the inducement consists of one party's misrepresenting a material fact concerning the subject matter of the underlying transaction and the other party's relying on the misrepresentation to his, her, or its detriment in executing a document or taking a course of action." Solymar Investments, Ltd. v. Banco Santander S.A., 672 F.3d 981, 994 (11th Cir. 2012) (citations omitted).

AO 72A
(Rev. 8/82)

Georgia courts have held that slight circumstances may be sufficient to prove its existence." Wilson v. S & L Acquisition Co., 940 F.2d 1429, 1440 (11th Cir. 1991). "Fraud is by definition subtle 'and can be accomplished in an infinite number of ways.'" Tr., 2012 WL 12836517, at *8 (quoting Federal Ins. Co. v. Westside Supply Co., 590 S.E.2d 224, 229 (Ga. Ct. App. 2003)). "As a result, fraud is 'seldom ever susceptible of direct proof, [and] recourse to circumstantial evidence usually is required.'" Id. (quoting Lloyd v. Kramer, 503 S.E.2d 632, 634 (Ga. Ct. App. 1998)). Therefore, the general rule in Georgia is that "[e]xcept in plain and indisputable cases, scienter in actions based on fraud is an issue of fact for jury determination." Id. (quoting Farmers State Bank v. Huguenin, 469 S.E.2d 34, 37 (Ga. Ct. App. 1996)); see also GIW Indus., Inc. v. JerPeg Contracting, Inc., 530 F. Supp. 2d 1323, 1335 (S.D. Ga. 2008) ("Perhaps most importantly, it is peculiarly the province of the jury to pass on the circumstances showing fraud.").

Although Plaintiff's fraud claim involves a failure to perform a promise to pay in the future, Plaintiff also alleges and points to some supporting evidence of Defendants making that promise to pay either with the intent to not perform or knowing that it will be unable to pay in the future. Although Plaintiff does not point to any direct evidence of Pete Wright's intent, it does highlight circumstantial evidence showing Pete Wright's

AO 72A
(Rev. 8/82)

dishonest or misleading intent. Harvey Prater testified that in February 2017, when Pete Wright went to North Carolina to order the cattle from Plaintiff, Pete Wright's dairy had substantial financial problems and that WFD and LACH already had bills that they could not pay. Dkt. No. 119-4 at 10. On top of this testimony, Plaintiff points to the facts that WFD had multiple liens and judgments against them at this time—which is why LACH was formed in the first place—and that Pete Wright canceled the milk check assignment to Plaintiff, removed the identification tags from the cattle, and entered negotiations to sell some of the cattle within six weeks of accepting the final delivery from Plaintiff. Based on these facts, Plaintiff argues Defendants purchased the cattle merely to generate cash flow and had no intent to fully pay for the cattle at the time that they entered the contract.

This circumstantial evidence, however slight, is enough to raise a genuine dispute of material fact as to whether Defendants made false representations to Plaintiff and to Pete Wright's intent or scienter. Under Georgia law, this case is not plain and indisputable, and thus, Plaintiff's fraud claims must be decided by a jury. Therefore, with respect to Plaintiff's fraud and fraud in the inducement claims in Count Four of the Complaint and

AO 72A
(Rev. 8/82)

Crossclaim Count I against WFD and Pete Wright,[23] Defendants' Motions are **DENIED**.

### B. Fraudulent Transfers

Plaintiff also claims that Defendants fraudulently transferred cattle to other buyers while Plaintiff had a security interest in those cattle. Defendant responds by arguing that Plaintiff and Defendants did not have a creditor-debtor relationship.

The elements of a fraudulent transfer claim are described in O.C.G.A. § 18-2-75(a) (2018), which states:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Georgia courts have explained that "[a] debtor who generally is not paying his debts as they become due is presumed to be insolvent." Rapp, 695 S.E.2d at 746.

Here, Plaintiff's claim for fraudulent transfer survives a motion for summary judgment because a genuine dispute of material fact exists as to whether a creditor-debtor relationship existed

---

[23] Pete Wright's Motion is denied to this claim because the evidence shows that he was the managing member of WFD and held himself out as a representative of WFD and LACH when purchasing cattle from Plaintiff in North Carolina. Thus, if a jury finds evidence supporting a fraud claim, that claim can apply to Pete Wright individually for any of his own potential misrepresentations on behalf of his companies.

AO 72A
(Rev. 8/82)

between Plaintiff and Defendants, because Defendants transferred cattle to other entities without paying Plaintiff proceeds from those transfers, and because WFD and LACH were insolvent at the time of those transfers. First, as discussed above, a genuine dispute of material fact exists as to whether Plaintiff had a security interest in the cattle sold to Defendant based on the reservation language in the invoices for the two February 2017 deliveries. This dispute would also apply to whether Plaintiff was a creditor of Defendant whose claim arose before any transfers were made in this case. Second, Plaintiff has presented evidence that WFD took over all of the cattle from LACH, that WFD sold some of those cattle to Gutman Brothers, that Pete Wright transferred the proceeds of that sale to Levi Wright to buy new cattle from Gutman Brothers, that WFD sold cattle to New Holland, and that Pete Wright attempted to have New Holland send the proceeds from that sale to an account for Asbury Farm to "hide it" and keep the money "out of creditors hands," dkt. no. 104-2 34, 55. Third, Plaintiff has presented evidence that Defendants are insolvent as they were not paying, and by their own admission, could not pay their debts. Pete Wright actually admitted to creating LACH and Asbury Farm to avoid WFD's debts. Moreover, Defendants admit that WFD and LACH were insolvent at least as early as the final delivery of cattle on June 5, 2017.

Therefore, summary judgment on Plaintiff's claim of fraudulent transfer is improper. Defendants' Motions with respect to claims against Pete Wright[24] and WFD under Crossclaim Count VI are **DENIED**.

## IV. Civil Conspiracy Claim

Plaintiff also brings a stand-alone claim of civil conspiracy against Defendants based on the underlying torts of fraud, fraud in the inducement, and civil conversion. This claim in Count Eight of the Complaint is only against Pete Wright, WFD, LACH, and WPW.[25] The Court has granted summary judgment for Defendants on Plaintiff's civil conversion claim, leaving only the fraud claims as the bases for the conspiracy claim. Defendants argue that there is no evidence that Pete Wright, WFD, or WPW conspired with anyone to commit a tort against Plaintiff.[26]

"To recover damages for a civil conspiracy claim, a plaintiff must show that two or more persons, <u>acting in concert</u>, engaged in conduct that constitutes a tort." <u>Mustaqeem-Graydon v. SunTrust Bank</u>, 573 S.E.2d 455, 461 (Ga. Ct. App. 2002) (emphasis added).

---

[24] Pete Wright's Motion is denied on this count because the record shows that he was the managing member of WFD and the individual coordinating these allegedly-fraudulent transfers with other entities. Thus, Defendant has failed to show an absence of a genuine dispute of material fact as to Pete Wright's liability for fraudulent transfer under Crossclaim Count VI.

[25] The count also includes FNB South, but all claims against FNB South have been resolved in this case.

[26] Defendants also incorrectly assert that there is no cause of action for civil conspiracy. The case cited by Defendants for this proposition explains that there is no cause of action for civil conspiracy standing alone; rather, the claim must be grounded in some underlying tort. <u>See</u> <u>McIntee v. Deramus</u>, 722 S.E.2d 377, 379 (Ga. Ct. App. 2012).

AO 72A
(Rev. 8/82)

"The essential element of the alleged conspiracy is proof of a common design establishing that two or more persons in any manner, either positively or tacitly, arrive at a mutual understanding as to how they will accomplish an unlawful design." McIntee v. Deramus, 722 S.E.2d 377, 379 (Ga. Ct. App. 2012) (emphases added) (citation omitted) (internal quotation marks omitted).

Here, Defendants met their burden to show an absence of a dispute of material fact by stating that there is no evidence in the record of a conspiracy. The burden then shifts to Plaintiff to point to specific facts in the record demonstrating that a genuine dispute of fact does exist as to whether a conspiracy existed. To do this, Plaintiff stated that the Defendants conspired to derive benefits from the Plaintiff's cattle without pointing to any specific evidence. Assuming arguendo that an underlying tort can be established, Plaintiff fails to show evidence in the record of an agreement, understanding, common design, or action in concert between Pete Wright, WFD, WPW, or LACH to meet the essential element of a conspiracy claim. Therefore, because Plaintiff has not met its burden on this claim, Defendants' Motions with respect to Count Eight of the Complaint are **GRANTED**.

## V. Claims Against WPW

In every count of the Complaint and in Count VIII of the Crossclaim, Plaintiff asserts claims against WPW. Defendants

AO 72A
(Rev. 8/82)

argue that WPW—a landholding company, not a dairy farm—should not be liable for any of these claims because there is no evidence connecting it to the alleged actions in this case. Defendants are correct.

Plaintiff's main arguments for why WPW should be liable in this case are as follows: Pete Wright disregarded the corporate form with other entities so that should implicate WPW, Pete Wright transferred money between other entities and some of that money is unaccounted for and might have gone to WPW, WPW's registered office was at Pete Wright's personal residence as well as the offices for WFD and LACH, Pete Wright paid the property tax bills for Levi Wright's dairy, Hurricane Creek, which was located on property owned by WPW in Pierce County, and Hurricane Creek was making payments on WPW's bank note prior to the land being foreclosed on. These facts fail to show that WPW should be liable for any of the claims involving Defendants' purchase of cattle from Plaintiff. The most direct evidence of WPW's involvement in this case has to do with the facts involving Hurricane Creek, but while these facts might be relevant to Hurricane Creek's liability, they are too attenuated to attach liability to WPW in this case.

Looking specifically to the various counts against WPW, WPW was not a party to any contract for the sale of cattle with Plaintiff under Count One. Moreover, Plaintiff has not shown that WPW made any promise to Plaintiff for a promissory estoppel claim

55

or that WPW was unjustly enriched under Counts Two and Three.[27]  As

to Count Four for fraud and fraud in the inducement, Plaintiff has

failed to show that WPW or Pete Wright on behalf of WPW made any

misrepresentations to Plaintiff.   Additionally, Plaintiff has

failed to show that WPW did anything to interfere with any alleged

security interest that Plaintiff may have had in the cattle sold

to Defendants under Count Six.   Plaintiff failed to establish

ownership for the civil conversion claim under Count Seven, so it

also fails with regard to WPW, and Count Eight for civil conspiracy

has the same result with respect to WPW since Plaintiff could not

show any agreement or meeting of the minds.

Finally, Plaintiff hinges multiple arguments for WPW's

liability on the possibility that it could be a successor in

interest to the debts of the other entities under the mere

continuation theory.   Plaintiff argues that Pete Wright was the

managing member of WPW and WFD, the names of the entities are

similar, they shared a principal office address, and at some point,

were both leasing land to dairy farms.   However, WPW's relationship

with WFD is distinguishable and does not warrant a finding of

successor liability.   Unlike WFD and LACH's relationship, WPW was

not operating a dairy farm, entering into contracts for cattle,

taking over dairy operations, taking over milk assignments, or

---

[27] The assertion that some of the unaccounted-for funds from WFD and LACH could
have gone to WPW is insufficient.

56

transferring thousands of dollars to WFD. Plaintiff has not shown facts demonstrating that WPW is a mere continuation of WFD, or vice-versa, in the same way that WFD is a successor in interest of LACH. Most importantly, Plaintiff cannot point to a single transfer of money between WPW and WFD or that WPW was at any point operating a dairy farm. For these reasons, Plaintiff's claim under Crossclaim Count VIII also fails. Therefore, WPW's Motion is **GRANTED** as to all counts against it.

### VI. Damages Issues

#### A. Prejudgment Interest

Plaintiff has included a claim for prejudgment interest under Count Ten of the Complaint. Defendants argue for summary judgment on this count because Plaintiff is not entitled to any judgment, and thus, Plaintiff would not have any judgment upon which to collect prejudgment interest. As this Court has found a judgment against WFD and Pete Wright for breach of contract and denied Defendants Motions with respect to other pending claims, Defendants' argument on this count is without merit. Thus, Defendants' Motions with respect to Count Ten are **DENIED.**

#### B. Attorneys' Fees and Litigation Costs

Under Count Eleven of the Complaint, Plaintiff also requests attorneys' fees and litigation costs under O.C.G.A. § 13-6-11 (2018), which provides for recovery where "the defendant has acted in bad faith, has been stubbornly litigious, or has caused the

AO 72A
(Rev. 8/82)

plaintiff unnecessary trouble and expense." Defendants argue they are entitled to summary judgment on this claim for attorneys' fees.

"For the purposes of the statute, 'bad faith' means 'bad faith during the transaction out of which the lawsuit arose.'" Sommers v. Hall, No. CV 408-257, 2010 WL 1963381, at *4 (S.D. Ga. May 13, 2010) (quoting Capital Health Mgmt. Group, Inc. v. Hartley, 689 S.E.2d 107, 116 (Ga. Ct. App. 2009)). Here, Plaintiff has pointed to evidence in the record that Pete Wright created entities like LACH and Asbury Farms to avoid his debts to creditors and hide money and that he may have committed fraud by entering into the contract with Plaintiff while not intending to fully pay for the cattle. A jury could find evidence related to these facts amounts to bad faith and warrants granting attorneys' fees. "Moreover, questions as to whether a party has acted in bad faith are generally for the jury to decide." Id. (citing Merlino v. City of Atlanta, 657 S.E.2d 859, 863 (2008)). Accordingly, Defendants' Motions with respect to Count Eleven of the Complaint are **DENIED**.

### C. Punitive Damages

Plaintiff also requests punitive damages against Defendant under Count Twelve of the Complaint. Defendant argues that it is entitled to summary judgment on this issue because Plaintiff has not established any tort claims against the Defendants. First, the Court has held that genuine issues of fact require a jury to determine Plaintiff's fraud claims, which are actions in tort.

AO 72A
(Rev. 8/82)

Second, Georgia courts have held that the Georgia code provision providing for punitive damages, O.C.G.A. § 51-12-5.1 (2018), "by its plain language . . . provides that a determination of punitive damages must be made by the trier of fact." Caldwell v. Church, 802 S.E.2d 835, 843 (Ga. Ct. App. 2017). As a result, "[t]he issue of punitive damages is ordinarily for the jury." Id. (alteration in original) (citation omitted). Therefore, Defendants' Motions with respect to Count Twelve of the Complaint are **DENIED**.

### CONCLUSION

For these reasons, Plaintiff's Motion for Partial Summary Judgment, dkt. no. 104, is **GRANTED IN PART AND DENIED IN PART**; Pete Wright's Motion for Summary Judgment, dkt. no. 100, is **GRANTED IN PART AND DENIED IN PART**; WFD's Motion for Summary Judgment, dkt. no. 101, is **GRANTED IN PART AND DENIED IN PART**; WPW's Motion for Summary Judgment, dkt. no. 103, is **GRANTED**. Additionally, Pete Wright and WFD's other Motion for Summary Judgment, dkt. no. 102, is **WITHDRAWN** as **MOOT**.

With regard to the specific claims in each motion at issue before the Court, Plaintiff's Motion, dkt. no. 104, is **GRANTED** with respect to Count One and Crossclaim Count VIII and **DENIED** as **MOOT** with respect to Counts Two and Three; Defendants Pete Wright, WFD, and WPW's Motions, dkt. nos. 100, 101, 103, are **GRANTED** with respect to Counts Seven and Eight and Crossclaim Counts II and IV; Defendants Pete Wright and WFD's Motions, dkt. nos. 100, 101, are

59

**DENIED** with respect to Counts One, Four, Six, Ten, Eleven, and Twelve and Crossclaim Counts I, III, V, VI, and VIII, and their Motions are **DENIED** as **MOOT** as to Counts Two and Three; Defendant WPW's Motion, dkt. no. 103, is **GRANTED** with respect to all counts. Counts Five and Nine and Crossclaim Count VII are **DISMISSED** as **MOOT.** Defendants' Motion in dkt. no. 102 is **MOOT** and **WITHDRAWN.** Default Judgment against Defendant Lower Appling County Holsteins ("LACH") is **GRANTED.**

The Clerk is **DIRECTED** to terminate the following parties from the case: (1) W.P. Wright Family, LLC, D/B/A, The Wright Family Dairy Farms, LLC; (2) Lower Appling County Holsteins, LLC; and (3) Lower Appling County, LLC.

The following claims and parties **REMAIN PENDING** in this case: Count Four against Pete Wright and WFD; Count Six against Pete Wright and WFD; Count Ten against Pete Wright and WFD; Count Eleven against Pete Wright and WFD; Count Twelve Against Pete Wright and WFD; Cross Claim Count I against Pete Wright and WFD; Cross Claim Count III against Pete Wright and WFD; Cross Claim Count V against Pete Wright, WFD, Raymond Wright, Glenda Wright, Asbury Farms, Hurricane Creek Dairy, and Levi Wright; Cross Claim Count VI against WFD, Pete Wright, Asbury Farms, Hurricane Creek Dairy, Raymond Wright, Glenda Wright, and Levi Wright; and Cross Claim Count VIII (Successor Liability) against Asbury Farms and Hurricane Creek Dairy.

**SO ORDERED**, this 19th day of February, 2019.

HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

AO 72A
(Rev. 8/82)